Below is an order of the court.

_David W. Hercher_

DAVID W. HERCHER
U.S. Bankruptcy Judge

## UNITED STATES BANKRUPTCY COURT

### DISTRICT OF OREGON

| | |
|---|---|
| In re: | Case No. 22-30011-dwh12 |
| MARK E. DELONG, | ORDER GRANTING MOTION FOR AUTHORITY TO OBTAIN CREDIT |
| Debtors. | |

THIS MATTER having come before the Court on April 5, 2022, upon the Motion for Authority to Obtain Credit [ECF No. 31] (the "***Motion***"); notice of the Notice of Final Hearing on Motion having been given pursuant to Bankruptcy Rule 4001(c) and LBR 4001-1(c); the Court having considered the arguments of counsel and all relevant pleadings, exhibits, and documents of record in this case, and the representation of counsel at the time of hearing; now, therefore,

THE COURT FINDS AS FOLLOWS:

1) Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on January 4, 2022 (the "***Petition Date***").

ORDER GRANTING MOTION AUTHORIZING DEBTOR TO OBTAIN CREDIT

{00508044:3}

**MOTSCHENBACHER & BLATTNER LLP**
117 SW Taylor Street, Suite 300
Portland, Oregon 97204
Phone: 503-417-0500
Fax: 503-417-0501
www.portlaw.com

2)  Debtor continues in possession of his property and is continuing to operate and manage his business as debtor-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

3)  The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(b) and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

4)  Producers Livestock Marketing Association ("*PLMA*") has agreed to continue the extension of credit (the "*Loan*") to Debtor on a secured basis pursuant to 11 U.S.C. § 364(c)(2) on the terms set forth in the Producers Livestock Marketing Association Feeding and Grazing Contract and Agreement dated November 18, 2021 (the "*2021 Contract*") and the Third Amendment to Producers Livestock Marketing Association Feeding and Grazing Contract and Agreement (the "*Amendment*"), both of which are attached hereto as **Exhibit A** and **Exhibit B,** respectively (together, the "*Contract Documents*").

5)  Debtor has concluded that the Loan is necessary to fund his continued operations, which will provide the basis for a Chapter 12 Plan, and further believes that he will not be able to adequately fund a Plan without such financing.

6)  Debtor is unable to obtain adequate financing on equal or more favorable terms than those offered by PLMA.

7)  Debtor believes the proposed terms and conditions of the financial accommodations provided in the Contract Documents are fair and equitable, and in the best interest of Debtor's estate.

/ / / / /

/ / / / /

/ / / / /

ORDER GRANTING MOTION AUTHORIZING DEBTOR TO OBTAIN CREDIT

{00508044:3}

**Motschenbacher & Blattner LLP**
117 SW Taylor Street, Suite 300
Portland, Oregon 97204
Phone: 503-417-0500
Fax: 503-417-0501
www.portlaw.com

Based on the foregoing, good cause exists to grant the Motion on a final basis; now, therefore,

IT IS HEREBY ORDERED as follows:

a)     The Motion is GRANTED;

b)     Debtor is authorized to execute, if not previously executed, and deliver to PLMA, the Contract Documents, and any notes or other loan documents incidental thereto (collectively, the "***Loan Documents***").

c)     Debtor is authorized to incur indebtedness under the terms of the Loan Documents and otherwise make such payments and perform such obligations as required or permitted under the terms of the Loan Documents.

d)     Debtor is granted authority, pursuant to § 364(c)(2) of the Bankruptcy Code, to execute and deliver deeds of trust or other security documents to PLMA, to provide liens against the Collateral, as specified in the Loan Documents;

e)     If any or all provisions of this Order are hereafter reversed, modified, vacated or stayed by any subsequent order of this Court, such reversal, modification, vacation or stay shall not affect the validity of any obligation to PLMA that is or was incurred by Debtor pursuant to this Order, and that is or was incurred prior to the Effective Date of such reversal, modification, vacation or stay.  Such reversal, modification, vacation or stay shall not affect the validity and enforceability of any priority authorized or granted by this Order.

f)     Until the Bankruptcy Case is closed, the Debtor, in his monthly operating reports under FRBP 2015, shall include a summary of the amounts advanced by PLMA pursuant to this Order, the date(s) of such advances, and the outstanding balance owed to PLMA.

###

Page 3 of 4

Page 3 of 4    ORDER GRANTING MOTION AUTHORIZING DEBTOR TO
OBTAIN CREDIT

{00508044:3}

**Motschenbacher & Blattner LLP**
117 SW Taylor Street, Suite 300
Portland, Oregon 97204
Phone: 503-417-0500
Fax: 503-417-0501
www.portlaw.com

Case 22-30011-dwh12    Doc 35    Filed 04/05/22

I certify that I have complied with the requirements of LBR 9021-1(a)(2)(A).

PRESENTED BY:

MOTSCHENBACHER & BLATTNER LLP

 /s/ Nicholas J. Henderson
Nicholas J. Henderson, OSB No. 074027
nhenderson@portlaw.com
117 SW Taylor St., Suite 300
Portland, OR 97204
(503) 417-0508 Direct
(503) 417-0528 Facsimile
nhenderson@portlaw.com

*Attorneys for Debtor Mark E. Delong*

PARTIES TO SERVE:

**VIA CM/ECF:**                                      **VIA FIRST-CLASS MAIL:**

All CM/ECF participants.                         All parties listed on the most current mailing
                                                              matrix maintained by the Court.

Page 4 of 4   ORDER GRANTING MOTION AUTHORIZING DEBTOR TO
              OBTAIN CREDIT

{00508044:3}

MOTSCHENBACHER & BLATTNER LLP
117 SW Taylor Street, Suite 300
Portland, Oregon 97204
Phone: 503-417-0500
Fax: 503-417-0501
www.portlaw.com

Case 22-30011-dwh12    Doc 35    Filed 04/05/22

**EXHIBIT A**

**2021 CONTRACT**

# PRODUCERS LIVESTOCK MARKETING ASSOCIATION
## FEEDING AND GRAZING CONTRACT AND AGREEMENT

**THIS FEEDING AND GRAZING CONTRACT AND AGREEMENT** hereinafter referred to as ("**Agreement**") is made and entered into effective as of <u>18th</u> day of <u> November </u>, 20<u>20</u>, by and between **PRODUCERS LIVESTOCK MARKETING ASSOCIATION,** a Utah agricultural cooperative, hereinafter referred to as (**"Producers"**), having its principle offices located at 230 West Center, North Salt Lake, Utah, and **MARK EARL DELONG,** an individual, (collectively, whether one or more), hereinafter referred to as ("**Feeder**") having his principal place of business located at 2090 7th Avenue West Vale Oregon 97918.

WITNESSETH:

In consideration of the mutual covenants and agreements herein contained, as well as the mutual performance thereof, **Producers** and **Feeder** agree as follows:

**SECTION 1.     PURPOSE.**     The purpose of this program has been set forth in the Livestock Feeding/Grazing Program Proposal, the terms and conditions of which are incorporated by this reference. **Feeder** warrants and represents that they have received a copy of the Proposal and that they have read and fully understands the Proposal and this Agreement.

**SECTION 2.     TERM AND MATURITY.**     This Agreement shall expire on <u>April 30, 2021,</u> which shall not to exceed 365 days after the effective date of the Agreement written above. Once the Agreement has matured and expired, **Feeder** will not be able to make any further livestock purchases until after the Agreement is renewed and re-established which shall be at the sole and absolute discretion of **Producers**.

**SECTION 3.     CONDITIONS.**     The **Feeder** hereby accepts whichever of the following conditions is reached (achieved) first, with respect to concentration limits set forth by **Producers**:

a.     A "<u>Total</u>" dollar amount including the purchase price of the livestock, risk management, freight, feed, medicines, fees, etc. not to exceed the sum of **ONE MILLION DOLLARS AND NO/100 dollars ($1,000,000.00),** subject to the conditions being met in this Agreement; or,

b.     The purchase, acquisition, delivery, or placement of livestock into the Feed and Grazing Program of approximately 1,500 head of cattle, subject to mutual verification by **Feeder** and **Producers**, and all offspring thereof ("**Livestock**"), subject to the conditions being met in this Agreement.

c.     The Livestock are to be identified separately from other **Non-Producers** livestock, if any, currently run on the property. **Feeder** hereby acknowledges that the Livestock are the property of **Producers**.

d.     **Feeder** agrees to feed the Livestock to the best of his ability, to provide reasonable and normal care, and to take such other action as shall be necessary to effectuate the intent of this Agreement.

e.     **Feeder** acknowledges and agrees that **Feeder** must demonstrate to **Producers**, in **Producers'** sole and absolute discretion, that **Feeder** will have the ability and financial resources to sufficiently feed and care for all of the Livestock, without any financing or if financing is necessary, then the standard creditors' release must be signed by the financing party, <u>before</u> **Producers** is obligated to provide any advances or additional advances, as applicable, under the terms of this Agreement.

GRAZING/FEEDING AGREEMENT - Page 1
C:\USERS\RAYC\DOCUMENTS\MARK DELONG 2020 PLMA CONTRACT (BK) (002).DOC November 17, 2020

49310.0002.11334609.4

**Exhibit A - Page 1 of 9**     Case 22-30011-dwh12     Doc 35     Filed 04/05/22

f.      **Feeder** further agrees to provide a (i) budget; (ii) updated and current financials and recent tax returns and (iii) to cause the Guarantor, Patricia Baker, to provide updated and current financials and recent tax returns, which must demonstrate the **Feeder** and Guarantor's ability to perform the terms of this Agreement, in the sole and absolute discretion of **Producers**, <u>before</u>, **Producers** is obligated to provide any advances, under the terms of this Agreement. If the finances do not support the ability of the **Feeder** to feed and care for the Livestock for the full amount of the purchase price of the Livestock set forth herein, but does establish that the **Feeder** has sufficient unencumbered feed and the financial ability to feed and care for a reduced amount of Livestock, then **Producers** agrees to allow the advances under this Agreement to the extent of the reduced amount that **Feeder** establishes the ability and financial resources to sufficiently feed and care for the Livestock.

g.      Except as expressly provided herein, all costs and expenses hereunder shall be borne by the **Feeder**. **Feeder** is responsible for inputs of feed, supplement, medication, and any other miscellaneous costs incurred in the normal course of feeding/grazing Livestock. **Producers** does not encourage placing the Livestock in the program in third party feedlots. However, any of the Livestock placed in a third-party feedlot at any time during the feeding cycle will require a $150 per head equity payment. Payment must be made to **Producers** prior to any of the Livestock being moved to the third-party feedlot.

h.      **Feeder** agrees to protect the Livestock against trespass, conversion, liens, and all other intentional or unintentional acts. **Feeder** agrees to give prompt notice of any act by any party which may adversely affect **Producers'** interest in the Livestock.

i.      **Feeder** acknowledges and agrees that **Producers** has the continuing right to recommend an appropriate feeding/grazing program and appoint a consultant to advise on the feeding/grazing program or health treatment procedures.

**SECTION 4.**      **OTHER COSTS. Feeder** acknowledges that **Feeder**/grazer is further responsible for all veterinarian and consulting costs, trucking costs and death losses, including but not limited to death losses resulting from fire, theft, sickness, and Act of God and such other risks and casualties as are normally covered by a broad farm insurance policy. When death loss accumulates to 2%, the loss shall be reported to **Producers** within twenty-four (24) hours of occurrence.

**SECTION 5.**      **HANDLING CHARGES, FEES AND INTEREST RATE. Producers** shall be entitled to the following fees and handling charges:

1.      <u>Handling Charges</u>. Full and normal handling charges for the purchase and sale of the livestock. For livestock purchased out of a **Producers** auction facility the handling charge will be $0.50 per cwt. For livestock purchased and/or sold involving any other transaction, the handling fee will be $1.00 per cwt with a minimum of $5.00 per head for all stock except breeding stock and bulls. For all breeding stock and bulls, the fee will not exceed $12.00 per head. For livestock that are sold through a **Producers** auction facility or video sale, the handling charge will be determined by the established tariff filed with the Packers and Stockyards Administration.

2.      <u>Interest Rate</u>.

        <u>Variable Rate of Interest</u>. Commencing on the date that funds are first disbursed by **Producers**, the rate of interest applicable to the Contract is a per annum variable interest rate as determined by **Producers** and as set forth herein below.

GRAZING/FEEDING AGREEMENT - Page 2
C:\USERS\RAYC\DOCUMENTS\MARK DELONG 2020 PLMA CONTRACT (BK) (002).DOC November 17, 2020

49310.0002.11334609.4

**Exhibit A - Page 2 of 9**      Case 22-30011-dwh12   Doc 35   Filed 04/05/22

Initial Rate. The interest rate initially assigned to this Contract, will be indexed to **Producers** Base Interest Rate ("Base Rate", as established by **Producers'** Lender, plus a spread of 300 basis points (i.e. 3.00%) over the Base Rate in effect at that time. As such, the interest rate as of the date of this Contract is calculated as follows:

| | |
|---|---|
| **Producers** Base Rate in effect | 3.25% |
| Applicable Margin | 3.00% |
| Initial Per Annum Interest Rate | 6.25% |

Interest Rate Calculations. Interest charges on any livestock purchased and/or placed into the Feeding and Grazing Program by **Feeder**, will be calculated as follows: Total Cost; times the Interest Rate assigned; times the number of days divided by 360.

The Total Cost can be determined by taking the cost of the load of livestock or the specific lot of livestock invoices, including all **trucking and miscellaneous charges, purchase handling charges, and all other costs and fees as set forth in this Contract and Agreement.**

3. Applicable Margin. The Applicable Margin assigned to this Contract may be adjusted from time to time based on changes in the **Feeder's** ability to care for the livestock placed in the Feeding and Grazing Program, financial ability and credit worthiness, costs of servicing the Contract and other factors as determined by **Producers** in its sole and absolute judgment and based on such financial information as may be required by **Producers**. Failure to remit financial information as and when requested by **Producers** may result in higher Applicable Margins.

4. Changes to Interest Rate. The rate of interest applicable to this Contract is subject to change whenever there is an increase or decrease in the Base Rate of Interest as established by **Producers'** Lender. Upon such increase or decrease in the Base Rate, the interest rate assigned to this Contract will then be increased or decreased on the first day of the following month following any increase or decrease in the Base Rate of Interest as established by **Producers'** Lender. Thereafter, the unpaid principal balance owing on the Contract and due thereunder, shall then bear such rate of interest from said date of change, until if any, the next Change Date. Each date on which the rate of interest changes, is called a "Change Date."

**SECTION 6.      PURCHASE AND DELIVERY OF LIVESTOCK.** **Feeder** may give written notice to **Producers** of his intent to purchase the Livestock. **Feeder** acknowledges and agrees to provide to **Producers** a written request for **Producers** to advance for the purchase of the Livestock by **Feeder**. At that time, **Feeder** will be charged the full handling charges, interest and costs for the purchase of the Livestock. Thus, **Feeder** recognizes that if **Producers** receives an invoice from a sale yard, it has no obligation to pay that invoice if the **Feeder** has not provided a written request establishing that the **Feeder** authorized that purchase.

Upon the **Feeder** causing the Livestock to be delivered to **Feeder**, then the **Feeder** will agrees to notify **Producers** of the delivery and agrees that within a week from the date of delivery the **Feeder** will cause the Livestock to be branded with Producers' brand and will coordinate with **Producers**, so that a representative of **Producers** can be present when the branding takes place. The **Feeder** is responsible for all branding fees.

**SECTION 7.      LOSS. Feeder** accepts all liability for the Livestock, including loss due to death, fire, theft, or act of God.

GRAZING/FEEDING AGREEMENT - Page 3
C:\USERS\RAYC\DOCUMENTS\MARK DELONG 2020 PLMA CONTRACT (BK) (002).DOC  November 17, 2020

49310.0002.11334609.4

**Exhibit A - Page 3 of 9**      Case 22-30011-dwh12    Doc 35    Filed 04/05/22

**SECTION 8.**     **RISK MANAGEMENT.** The **Feeder** may participate in a risk management program provided by Producers Livestock Commodity Marketing, or such other licensed commodity brokerage as approved by **Producers**. At **Producers'** sole discretion, a minimum position (i.e. hedge, option, etc.) may be placed. The profit or loss from hedges placed by **Producers** will be included in the expenses outlined in Section 9.

    **Feeder** shall also have the right, on his own accord, to participate in a risk management program. **Producers** advise that the risk in trading commodity futures can be substantial. **Feeder** should, therefore, carefully consider whether such trading is suitable for **Feeder**. To the extent **Feeder** requests funds from **Producers** to participate in a risk management program, or to the extent **Producers** shall purchase a minimum position, the cost of funds including accrued interest shall be added to the total cost of the Livestock and shall be deducted from the net sale as provided in this agreement.

    **SECTION 9.**     **COMPENSATION.** Upon completion of the sale of all Livestock, **Feeder** shall be entitled to or responsible for the difference between the net sale and the sum of the cost basis of the Livestock, the handling charges and fees, and the out of pocket expenses incurred by **Producers**, which expenses shall include, but are not limited to costs of marketing, feeding/grazing, care, acquisition, transportation, insurance and loss incurred in a risk management account placed by **Producers** or the **Feeder**.

    Net proceeds for the final sale of all Livestock on the program shall be mailed to **Feeder** as soon as possible upon sale thru an auction, by Private Treaty, selling direct, or after receiving hot weights if sold on a dressed basis. Alternatively, **Feeder** may, at his election, require **Producers** to make the net proceeds available at a **Producers'** location, so that the **Feeder** or the Guarantor, Patricia Baker, can personally retrieve the net proceeds.

    All deficits shall be mailed to **Producers'** corporate office at 230 West Center, North Salt Lake, UT 84054, within 24 hours of final transaction.

    **SECTION 10.**     **INSPECTION, INVENTORY, RECORDS, and COOPERATION.** **Feeder** hereby agrees to permit **Producers'** agents to inspect the Livestock on demand. **Producers** intends to inspect the Livestock at least monthly. **Feeder** further agrees to provide **Producers** a signed inventory report, which shall be in the form of a Borrowing Base Certificate which identifies the Livestock, directed to **Producers'** corporate office at 230 West Center, North Salt Lake, Utah 84054, on a monthly basis.

**Feeder** agrees to cooperate with **Producers** to provide **Producers** with any and all reasonably requested documentation to support compliance with the terms of this Agreement, including information supporting the budget and ability to feed and care for the Livestock. **Feeder** shall provide to **Producers** on a monthly basis proof of payment of any feed acquired by **Feeder** to feed the Livestock.

    **Producers** agrees to cooperate with **Feeder** to provide **Feeder** with any and all reasonably requested documentation as to any charges, advances, or payments identified in the monthly statement sent to **Feeders**.

    **Producers** agrees to provide to **Feeder** on a monthly basis, a statement identifying purchases and payments. **Feeder** agrees to review the statements and if there is any dispute as to funds advanced for Livestock, application of payments, or any other issues as to the statement, **Feeder** agrees to provide to **Producers** a written statement regarding the dispute, within forty-five (45) days of the date of the statement. **Producers** agrees to cooperate and timely respond to **Feeder** to attempt to resolve the dispute. If no written dispute is received by **Producers** within the forty-five (45) days, then the **Feeder** waives any claims and issues in that regard.

GRAZING/FEEDING AGREEMENT - Page 4
C:\USERS\RAYC\DOCUMENTS\MARK DELONG 2020 PLMA CONTRACT (BK) (002).DOC November 17, 2020

49310.0002.11334609.4

**Exhibit A - Page 4 of 9**      Case 22-30011-dwh12     Doc 35     Filed 04/05/22

**Feeder** acknowledges that the Guarantor, Patricia Baker, is entitled to directly obtain and request information and documents and payments from **Producers** without notice to **Feeder**, up to and until the time that **Feeder** delivers written notice to **Producers** that Patricia Baker is no longer authorized.

**SECTION 11.   IDENTIFICATION OF LIVESTOCK.** All Livestock shall be branded with a **Producers** brand or a brand leased to **Producers** upon arrival to the feeding/grazing location. **Feeder** agrees to keep Livestock in a feeding/grazing location separate from livestock owned by **Feeder** or others at all times. **Producers** will furnish its branding iron.

**SECTION 12.   DISCLAIMER OF WARRANTIES. PRODUCERS** SHALL NOT BE DEEMED TO HAVE MADE ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AS TO THE CONDITION OF THE LIVESTOCK, OR ANY OTHER REPRESENTATION OR WARRANTY WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO THE LIVESTOCK DELIVERED PURSUANT TO THE TERMS OF THIS AGREEMENT. ACCEPTANCE BY **FEEDER** OF THE LIVESTOCK SHALL CONSTITUTE ACKNOWLEDGMENT THAT THE LIVESTOCK WERE RECEIVED BY THE **FEEDER** IN A CONDITION SATISFACTORY TO THE **FEEDER. FEEDER** FURTHER ACKNOWLEDGES THAT UPON ACCEPTANCE OF THE LIVESTOCK, **FEEDER** ASSUMES RESPONSIBILITY TO INDEMNIFY **PRODUCERS** FOR ALL RISK OF DEATH LOSS, INCLUDING BUT NOT LIMITED TO LOSS FROM FIRE, THEFT, SICKNESS, ACT OF GOD, OR SUCH OTHER RISKS OR CASUALTIES AS ARE NORMALLY COVERED BY A BROAD FARM INSURANCE POLICY.

**SECTION 13.   TITLE.** The parties hereto agree that the Livestock are and will remain, and at all times shall be deemed to be the **sole and exclusive property** of the Producers, and **Feeder** has no right of property therein.

**SECTION 14.   WAIVER OF RIGHT, CLAIM, INTEREST AND LIENS.** In consideration of the compensation to be paid, **Feeder** hereby waives any right, claim, interest and all liens or claim of right of lien in the livestock which may arise in connection with **Feeder's** services hereunder.

**SECTION 15.   FILING. Feeder** will cooperate with **Producers** for the purpose of protecting title in the Livestock. Without limiting the foregoing, **Feeder** will execute all financing statements, subordination agreements and recordable instruments evidencing or relating to **Producers'** title and ownership of the Livestock. In connection therewith, **Feeder** acknowledges that **Producers** will be filing an informational financing statement (UCC/UCC-1/EFS/CFS) with the County Clerk and/or Secretary of State of any county and state in which the livestock may be located. The informational financing statement serves to give notice to others of **Producers'** ownership of the Livestock. **Feeder**/grazer agrees to allow **Producers** Livestock to electronically file the informational financing statement and their signature on this Agreement serves as their signature for these forms.

**SECTION 16.   EVENTS OF DEFAULT.** The following events shall constitute Events of Default:

a.   **Feeder** shall fail to perform any of the terms or conditions of this Agreement, the Proposal, the Security Agreement, or any other agreement entered into by **Feeder** and Producers.

b.   Any representation or warranty made by **Feeder** herein shall prove to be incorrect any time in any material respect.

c.   **Feeder** fails to obtain a Creditor's Release in a form acceptable to Producers from each and every lender that has or obtains in the future a security interest in the Feeder's livestock or feed.

GRAZING/FEEDING AGREEMENT - Page 5
C:\USERS\RAYC\DOCUMENTS\MARK DELONG 2020 PLMA CONTRACT (BK) (002).DOC November 17, 2020

49310.0002.11334609.4

**Exhibit A - Page 5 of 9**    Case 22-30011-dwh12   Doc 35   Filed 04/05/22

d. Any claims are made or liens are filed against the Livestock; although, if the lien is disputed by **Feeder**, then **Feeder** shall have sixty (60) days to have the lien removed or paid, or if **Feeder** believes a good faith dispute exist as to the lien, then **Feeder** shall have commenced a lawsuit to remove the lien within the sixty (60) days and shall not delay the litigation in any manner. **Feeder** agrees to indemnify **Producers** for any claims filed against the Livestock.

e. Any claims are made against **Producers** due to the **Feeder's** handling, feed, and care of the Livestock.

f. There is any default by the **Feeder** under the confirmed plan entered in the United States Bankruptcy Court of the District of Oregon, Case No. 17-34395-pcm11 ("**Confirmed Plan**"), which includes the payment to **Producers**, of the non-discharge claim of approximately $97,000 to be paid in accordance with the terms of the Confirmed Plan ("**Non-Discharge Claim**").

g. The Guarantor of the obligations hereunder, Patricia Baker, defaults under the terms of her Guaranty, or revokes the guaranty or fails to perform any terms or conditions of the Security Agreement issued in favor of Producers.

**SECTION 17.    ATTORNEY FEES.**  Should any action under this agreement be required, the unsuccessful party in such action shall pay to the successful party a reasonable amount for the successful party's attorney fees, in addition to all other sums that the unsuccessful party may be called on to pay, including costs of court. Further, should it be necessary for **Producers** to enforce the terms of this Agreement or the Proposal, then **Feeder** agrees to pay to Producers any and all attorney fees and costs incurred by Producers, including but not limited to any actions for **Feeder's** breach of this Agreement or Proposal and any actions taken by Producers to address any liens filed against or claims made against the Livestock by third parties.

**SECTION 18.    REMEDIES.**  On the occurrence of any Event of Default and failure to cure the default within ten (10) days that written notice of the default is sent to **Feeder**, or a termination, then **Producers** shall immediately have, in addition to its rights and remedies at law and in equity, any one or more of the following remedies:

a. The right to feed and care for the Livestock. All costs and expenses of feeding/grazing and caring for the Livestock may be offset against any amounts due to **Feeder**;

b. The right to cure any other default of **Feeder** upon three (3) days' notice to **Feeder** by making such payment or performing or complying with such obligation of **Feeder** in the amount of such payment. All expenses of **Feeder** incurred in connection with such payment of performance of or compliance with, as the case may be, may be offset against any amounts due to **Feeder**;

c. Right to enter **Feeder's** lot or premises anytime and remove the Livestock and liquidate the Livestock in its sole discretion and apply against the amounts due by the Feeder under the terms of the Agreement;

d. Accelerate the obligations due under the Agreement by **Feeder**;

GRAZING/FEEDING AGREEMENT - Page 6
C:\USERS\RAYC\DOCUMENTS\MARK DELONG 2020 PLMA CONTRACT (BK) (002).DOC  November 17, 2020

49310.0002.11334609.4

**Exhibit A - Page 6 of 9**    Case 22-30011-dwh12    Doc 35    Filed 04/05/22

e.  To the extent that not all Livestock have been placed with the **Feeder,** terminate the obligation to place any further Livestock with the **Feeder,** which means that no further advances for the purchase of Livestock will be permitted under this Agreement; and

f.  Accrue default interest of 1 ½ % per month against the outstanding obligations owed by Feeder, until **Producers** is paid in full.

**Feeder** agrees that if there is an Event of Default, then pending the 10 day cure period, the **Feeder** will not be permitted to take any advances under this Agreement. Further, if **Producers'** equity position in the Livestock is endangered, then **Producers** shall be entitled to immediately take possession of the Livestock.

**SECTION 19.    TERMINATION.** This Agreement may be terminated by **Producers** upon thirty (30) days written notice to **Feeder. Feeder** hereby waives the thirty (30) day notice period and acknowledges that **Producers** may terminate the feeding/grazing program at any time, if such conditions exist that, will endanger **Producers'** equity position in the Livestock.

The **Feeder** may terminate the feeding arrangement at any time by giving thirty (30) days written notice and paying **Producers** for all costs incurred to the date of termination.

**SECTION 20.    ENTIRE AGREEMENT.** This Agreement, which incorporates the terms and conditions of the Proposal, constitutes the entire understanding of the parties and supersedes all prior agreements, understandings or negotiations, whether oral or written, and the parties hereto warrant that there are no mutual oral agreements contrary to this writing. The parties to this Agreement acknowledge that there are no other commitments made by **Producers** to **Feeder** or Guarantor, other than what is set forth in this Agreement.

**SECTION 21.    MODIFICATION.** This Agreement may not be amended or modified except by an instrument in writing executed by all parties.

**SECTION 22.    SIGNATORIES. Feeder** warrants as follows:

___XX_____(i) Feeder is an individual and is a resident of the State of Oregon. This Agreement is a legal, valid, and binding obligation of **Feeder** enforceable against **Feeder** in accordance with its terms.

_____(ii) **Feeder** is a corporation duly organized, validly existing, and in good standing under the laws of the State of _____. All action, corporate and otherwise, necessary to authorize **Feeder** to enter into this Agreement and perform its obligations pursuant to this Agreement have been taken. The Agreement has been duly authorized, executed and delivered to **Producers** and is a legal, valid, binding obligation of **Feeder** enforceable against **Feeder** in accordance with its terms.

_____(iii) **Feeder** is a partnership, limited liability company or other unincorporated association duly organized, validly existing, and in good standing of the laws of the State of . All action necessary to authorize **Feeder** to enter into this Agreement and perform its obligations pursuant to the Agreement has been taken. This Agreement has been duly authorized, executed and delivered by **Feeder** and is legal, valid and binding obligation of **Feeder**, enforceable against **Feeder** in accordance with its terms.

GRAZING/FEEDING AGREEMENT - Page 7
C:\USERS\RAYC\DOCUMENTS\MARK DELONG 2020 PLMA CONTRACT (BK) (002).DOC November 17, 2020

49310.0002.11334609.4

**Exhibit A - Page 7 of 9**    Case 22-30011-dwh12    Doc 35    Filed 04/05/22

**SECTION 23.    BINDING AGREEMENT.** This Agreement shall be binding upon the parties hereto, and their respective heirs, administrators, trustees, executors, personal representatives, successors and assigns.

**SECTION 24.    ASSIGNABILITY.** This Agreement may not be assigned by **Feeder** without the prior written consent of **Producers**.

**SECTION 25.    NOTICES.** All notices under this Agreement shall be in writing and mailed by registered mail to the parties at their addresses set forth above or to such other address as they may hereinafter furnish. Notices shall be deemed to be given where so mailed.

**SECTION 26.    SEVERABILITY.** In the event that one or more of the provisions of this Agreement should be deemed or held to be invalid, illegal, unenforceable or against public policy in any respect, the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

**SECTION 27.    MUTUAL RELEASE.** The Parties acknowledge that they have had a prior business history, and in consideration for the terms of the Confirmed Plan and this Agreement, each party, for and on behalf of themselves, successors, heirs and assigns, employees, officers, agents, shareholders, legal representatives, independent contractors, and insurers, does hereby now and forever, fully and finally, unconditionally release, acquit, and discharge the other, and their officers, agents, successors, heirs and assigns, employees, shareholders, legal representatives, independent contractors, and insurers, from any and all past, present, or future claims, demands, obligations, actions, damages, causes of action, losses, and costs, and all liability now accrued or hereafter to accrue, which they may have against them prior to the date of this Agreement, except there is no release as to the **Feeder** as to the obligations owed by the **Feeder** under the Confirmed Plan, including the Non-Discharge Claim; nor is there a release as to the parties as to this Agreement, and the documents signed in further of this Agreement, including the security agreements and guaranties.

**SECTION 28.    MUTUAL WAIVER OF JURY TRIAL. TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW, THE PARTIES WAIVE ANY RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY ACTION OR PROCEEDING (a) BROUGHT BY FEEDER, GUARANTOR, OR PRODUCERS, OR ANY PERSON RELATING TO (i) THIS AGREEMENT OR ANY UNDERSTANDINGS OR PRIOR DEALINGS BETWEEN THE PARTIES (ii) THE OBLIGATIONS OWED BY FEEDER OR GUARANTOR TO PRODUCERS, OR (b) TO WHICH PRODUCERS IS A PARTY.**

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement on the day and date first above written.

*[signature page follows]*

GRAZING/FEEDING AGREEMENT - Page 8
C:\USERS\RAYC\DOCUMENTS\MARK DELONG 2020 PLMA CONTRACT (BK) (002).DOC  November 17, 2020

49310.0002.11334609.4

**Exhibit A - Page 8 of 9**    Case 22-30011-dwh12    Doc 35    Filed 04/05/22

**FEEDER:**

By signing, **Feeder** warrants that he has received a copy of the Proposal, and that he has read and understood the proposal and agrees to the terms of this Agreement.

By: _____
    Mark Earl Delong

By: _____
                    Witness

By: _____

By: _____
                    Witness

PROGRAM APPROVAL:

By: _____
    Rick O'Brien, President

GRAZING/FEEDING AGREEMENT - Page 9
C:\USERS\RAYC\DOCUMENTS\MARK DELONG 2020 PLMA CONTRACT (BK) (002).DOC  November 17, 2020

49310.0002.11334609.4

**EXHIBIT B**

**AMENDMENT**

# THIRD AMENDMENT TO PRODUCERS LIVESTOCK MARKETING ASSOCIATION FEEDING AND GRAZING CONTRACT AND AGREEMENT

This Third Amendment to Extend Termination Date of Producers Livestock Marketing Association Feeding and Grazing Contract and Agreement (the "**Agreement**") is made and entered into by and between **PRODUCERS LIVESTOCK MARKETING ASSOCIATION**, a Utah agricultural cooperative, hereinafter referred to as (**"Producers" or "PLMA"**), having its principle offices located at 230 West Center, North Salt Lake, Utah, and **MARK EARL DELONG**, an individual,  (collectively, whether one or more), hereinafter referred to as ("**Feeder**", or "**Delong**" or "**Debtor**") having his principal place of business located at 2090 7th Avenue West Vale Oregon 97918, dated this 18th day of February, 2022.  Producers and the Feeder are at times referenced herein as the "**Parties**."

## Recitals

A.      Delong filed a Chapter 11 bankruptcy petition in the United States Bankruptcy Court, District of Oregon, in 2017, as Case No. 17-34395-pcm11 ("**2017 Bankruptcy**").

B.      In the 2017 Bankruptcy case, the Bankruptcy Court entered an Order Approving Disclosure Statement and Confirming Debtor's First Amended Plan of Reorganization Dated August 24, 2018 ("**2017 Confirmation Order**").  As to Producers, the 2017 Confirmation Order provided:

> In regard to Class 6- Producers Livestock Marketing Association ("**PLMA**"), (Paragraphs 3.2, 3.21, 5.6 of the First Amended Plan, Dkt. 146), the following terms are added:
>
> > The amended claim filed by Producers, as Claim No. 9, in the amount of $98,702.05, plus accruing interest and fees and costs is non-dischargable in this case and any other bankruptcy filed by the Debtor, to be paid in accordance with the terms of the First Amended Plan.  ("**Non-Dischargable Claim**").
>
> (Under the Plan, the Non-Dischargable Claim was to be paid over five years, in semi-annual payments, with interest accruing at prime plus 2%, commencing May 31, 2019.)
>
> If there is a breach in the payment terms to PLMA, and if that breach is not cured in the manner and in the time provided by the Plan, then PLMA may file a breach of contract action to obtain a monetary judgment, and proceed with its rights thereon.
>
> In regard to PLMA and Paragraph 8.4.1, Means for Implementation of the Plan, the following replaces Paragraph 8.4.1 in its entirety to clarify and provide the applicable terms: 8.4.1 Cattle Sales. The Debtor will obtain financing to restart his cattle farming business by entering into a Producers Livestock Marketing Association (PLMA) Feeding and Grazing Contract and Agreement, which incorporates the Livestock Feeding/Grazing Program Proposal, in a form acceptable to PLMA. The Debtor has further agreed to obtain a guaranty and

THIRD AMENDMENT TO PRODUCERS LIVESTOCK MARKETING ASSOCIATION FEEDING AND GRAZING CONTRACT AND AGREEMENT - 1

49310.0002.14525701.2

limited security agreement from Patricia Baker issued in favor of PLMA, as part of the PLMA Feeding Agreement. In general, pursuant to the Feeding Agreement and the Program, PLMA places livestock owned by PLMA with the Debtor. The Debtor is responsible for feeding and caring for the livestock and, in exchange, the Debtor is entitled to a certain profit (or responsible for a certain loss) upon the sale of the livestock. Producers receives a normal handling charge and interest under the Program. Subject to a signed agreement in a form acceptable to PLMA containing agreed upon terms, the Debtor would obtain credit of $1,000,000 for the purchase of the PLMA livestock, to restart the cattle operations. Although the PLMA livestock remain titled to PLMA, in an abundance of caution, the obligations owed under the Feeding Agreement are secured by the PLMA livestock and any offspring and proceeds thereof. The obligation will bear interest at prime plus 2% per annum. The Debtor will feed the livestock for approximately one hundred fifty (150) days, at which time the Debtor sells the livestock in accordance with the terms of the Feeding Agreement, and retains the profit (or incurs the loss, as applicable), which is expected by the Debtor to assist in the continued business operations, plan payments, and living expenses. Based upon the Debtor's experience in operating under the PLMA program, the Debtor has projected to generate revenues as set forth on the Exhibit C attached to the First Amended Plan, Dkt. 146. A condition of the PLMA Feeding Agreement is that the Debtor must provide assurance of his ability and means to feed and care for the PLMA livestock, and if the Debtor obtains financing for that feed and care, then the Debtor has agreed to obtain a release in a form acceptable to Producers and the financing party to ensure that the Debtor is authorized to feed and care for the PLMA livestock with PLMA having a priority interest in the PLMA livestock and any offspring thereof, with the parties acknowledging the security interest of the financing party in the net proceeds due Debtor. If the Debtor's finances do not support the ability of the Debtor to feed and care for the PLMA livestock for the full amount of the price of the livestock, but does establish that the Debtor has sufficient unencumbered feed and the financial ability to feed and care for a reduced amount of PLMA livestock, then PLMA shall allow the advances under the Feeding Agreement to the extent of the reduced amount that the Debtor establishes the ability and financial resources to sufficiently feed and care for the PLMA livestock.

("**2017 Confirmation Order Terms**").

C.    Upon the entry of the 2017 Confirmation Order, on March 18, 2020, Producers entered into a Feeding and Grazing Contract and Agreement with the Feeder, which had a maturity date of September 30, 2020 ("**2020 Contract**"). On November 18, 2020, Producers entered into a Feeding and Grazing Contract and Agreement with the Feeder, which had a maturity date of April 30, 2021, and increased the interest rate to three percent (3%) above prime ("**2021 Contract**").    To provide the Feeder additional time to fulfill the terms of the 2021 Contract, Producers agreed to two extensions, ultimately extending the maturity date to December 31, 2021.

D.     The Feeder did not pay the full obligation due and owing under the 2021 Contract on December 31, 2021, but was otherwise in compliance with the terms of the 2021 Contract. On January 4, 2022, the Feeder filed a Chapter 12 Bankruptcy Petition ("**2022 Bankruptcy**").

E.     The current obligations due to Producers under the 2021 Contract and the Non-Dischargable Claim are as follows:

(1)  Lot #1350 Fats, $25,517.43, which consists of principal of $25,380.72 and interest of $136.71;

(2)  Lot #1351 Mix, $79,108.94, which consists of principal of $78,617.54 and interest of $491.40;

(3)  Lot #1352  HF, $62,157.25, which consists of principal of $61,372.66 and interest of $784.59;

(4) Lot #1353  ST, $66,387.83, which consists of principal of $65,564.09 and interest of $823.74; and

(5)  Non-dischargable Claim (also known as Lot #62601 Cows), $46,830.78, which consists of principal of $46,015.72 and interest of $815.06.

F.     Delong has requested that Producers enter into a new feeder contract with Delong. Due to the early status of the 2022 Bankruptcy and the default under the bank loan encumbering the real property where the livestock under the 2021 Contract are maintained ("**Producers Livestock**"), Producers is not willing to currently enter into a new contract.  Nevertheless, due to the recent inspection of the Producers Livestock and the performance and communications under the 2021 Contract by the Feeder, Producers is willing to enter into a six (6) month extension of the 2021 Contract ("**Extension**"), pursuant to the terms and conditions herein, which includes an approval of the Extension by the Court in the 2022 Bankruptcy.

NOW, THEREFORE, in consideration of the mutual promises, covenants and agreements contained herein, and for other good and valuable considerations, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

<u>Agreement</u>

1.     <u>True and Correct Recitals</u>.     The Feeder acknowledges and agrees that the description, information, and factual statements contained in the above Recitals are accurate and are incorporated within this Agreement as if fully rewritten herein.

2.    Feeder's Representations and Warranties.  As a material inducement to Producers entering into this Agreement, Feeder represents, warrants, certifies, covenants and acknowledges that each of the following is true:

2.1    Authority.  The execution, delivery and performance of this Agreement and the transactions contemplated herein have not resulted and will not result in a breach or violation of any provision of (i) Feeder's other governance documents, (ii) any statute, law, rule or regulation applicable to Feeder, (iii) any judgment, injunction, order, decree, writ or determination applicable to Feeder, or (iv) any contract, agreement or other instrument by which Feeder may be bound or to which any of Feeder's assets are subject.

2.2    Feeder Has Read and Understands Agreement; Independent Legal and Tax Advice.  THE FEEDER HAS READ THIS AGREEMENT AND FULLY UNDERSTANDS HIS RESPECTIVE RIGHTS AND OBLIGATIONS HEREUNDER.  FEEDER IS NOT ACTING UNDER ANY TYPE OF DURESS OR COMPULSION.  FEEDER HAS HAD ADEQUATE OPPORTUNITY TO CONSULT WITH AN ATTORNEY AND TAX ADVISOR OF HIS OWN CHOICE AND OBTAIN INDEPENDENT LEGAL ADVICE PRIOR TO SIGNING THIS AGREEMENT.  THE EXECUTION AND DELIVERY OF THIS AGREEMENT IS FEEDER'S FREE AND VOLUNTARY ACT AND DEED.

2.3    Reaffirmation of 2022 Contract.  Feeder hereby ratifies and reaffirms the 2022 Contract, amendments thereto, the 2017 Confirmation Order Terms, and balances due in all respects, as itemized above.

2.4    Acknowledgment of Indebtedness.  Feeder's obligations and indebtedness to Producers under the 2022 Contract, constitutes a valid, just, legal and binding obligation of Feeder to Producers, fully enforceable in accordance with the terms of the 2021 Contract, as amended, the 2017 Confirmation Order Terms, and applicable law.

2.5    Compliance with Applicable Laws.  To the best of Feeder's knowledge, information and belief, as of the date of this Agreement, Feeder is in full compliance with all applicable federal, state, county, municipal and other governmental laws, ordinances, regulations, licenses and permits, relating to or in any way affecting Feeder's business operations.  All licenses, permits, registrations and certifications necessary for Feeder to conduct its business are in full force and effect.  Feeder has not received any notice, written or otherwise, from any governmental entity that Feeder is not, or may not be, in compliance with any of the foregoing.

2.6    Accurate Financial Information.  All information furnished by Feeder to Producers prior to the date of this Agreement, including financial statements, and all information hereafter furnished to Producers by or on behalf of Feeder is, or will be, as the case may be, true and accurate in every material respect on the date as of which such information is dated or certified, and none of such information is or will be inaccurate, incomplete or misleading by omitting to state any material fact necessary to make such information not misleading.  All such information fairly in all material respects (or, as to financial statements to be provided in the

future, will fairly in all material respects) represent the financial condition of Feeder as at the dates thereof and the results of operations for the periods then ended.

2.7   No Counterclaims or Setoffs.   As of the date of this Agreement, Feeder does not have any defenses to (or other avoidance of) the indebtedness evidenced by the 2021 Contract, as amended, or the Non-Dischargable Claim, including counterclaims, defenses, demands, counter demands, setoffs, recoupments or other claims of any kind or nature whatsoever that might give rise to (a) any liability of Producers to Feeder, (b) any reduction of Feeder's indebtedness to Producers, (c) any right to payment from Producers to Feeder, or (d) any right to an equitable remedy against Producers, based upon any action, event, error, omission or transaction occurring, or failing to occur, prior to the date of this Agreement.  Feeder does not have any knowledge or notice (actual, constructive or implied) of any facts, circumstances, actions, failure to act, conditions, errors, omissions, events or occurrences that might with the passage of time give rise to any such defense, avoidance, claim, counterclaim, demand, counter demand or right of setoff or recoupment against Producers.

2.8   No Obligation to Forbear or Modify.   Prior to execution and delivery of this Agreement by all Parties, Producers was entitled to rely on the contractual agreements and undertakings between the Parties set forth in the 2021 Contract, as amended, and the 2017 Confirmation Order Terms, and had no obligation to forbear from exercising its rights and remedies under the 2021 Contract, as amended, or negotiate with Feeder concerning amendment, extension, forbearance, modification or other financial accommodation. Producers' execution of this Agreement does not create any duties, expectations or rights, except as expressly set forth herein.   The Feeder acknowledges that he has no expectations or rights regarding further amendment, extension, forbearance, modification, other financial accommodations, or a new contract, which shall be at the sole discretion of Producers.

2.9   Business Decisions.   Those operating the business of Feeder, and the Feeder's agent, Patricia Baker, are sophisticated in the livestock business and related transactions.  Producers, including Producers' officers, employees, agents and representatives, have not taken part in Feeder's management or decisions, exercised control over Feeder's operations, or influenced Feeder's business relations.  Producers and its officers, employees and agents have not given Feeder any recommendations or advice, including business, financial, legal, investment or tax advice, or made any suggestions or recommendations regarding the conduct, management or operation of Feeder's business or financial affairs.   All such considerations and decisions are based on Feeder's own due diligence, business judgment, analysis, and advice from Feeder's financial advisors, accountants, consultants, attorneys or other professionals, without reliance of any kind, express or implied, on Producers.

2.10   Good Faith.   Producers, including Producers' officers, employees, agents and representatives, have at all times acted in good faith in connection with Feeder, the 2021 Contract, and in the discussions and negotiations in respect of this Agreement.

2.11   Reliance on Feeder's Representations.   Feeder understands and acknowledges that Producers, without independent investigation, is relying upon the accuracy of Feeder's representations, warranties, covenants, acknowledgments and statements of fact in this

Section 2 (and each subsection hereof) and such other representations, warranties, covenants, acknowledgments and statements of fact as are hereinafter set forth. Such representations, warranties, covenants, acknowledgments and statements of fact shall be continuing in nature and shall remain true and correct until all of Feeder's indebtedness under the 2021 Contract and Non-Dischargable Claim have been paid in full. Absent such representations, warranties, covenants, acknowledgments and statements of fact, Producers would not agree to the modification contained in this Agreement.

3.　　Producers Livestock.　Feeder represents and warrants that he has sufficient feed and all of that feed is available to feed and care for Producers Livestock is free and clear of all liens and of sufficient quantity to care and feed the Producers Livestock, pursuant to the terms of the 2021 Contract.

3.1　　Feeder acknowledges and agrees that he will not permit nor take direct action to move Producers Livestock from his property without the prior written consent of Producers, or the complete payment in regard to those livestock under the terms of the 2021 Contract.

4.　　Producers' Representations and Warranties.　Producers represents and warrants that each of the following is true:

4.1　　Producers has all requisite power to execute and deliver, and to perform all of its obligations under this Agreement.

4.2　　The execution and delivery of this Agreement has been duly authorized by all necessary action on Producers' part.

5.　　Enforceability.　This Agreement shall not become effective, binding or enforceable until the Feeder has fully executed this Agreement and the Court in the 2022 Bankruptcy has entered an order approving this Agreement.

6.　　Modification Provisions.

6.1　　Extension of Maturity Date.　Upon the entry of a court order approving this Agreement, the maturity date of the 2021 Contract shall be extended by six (6) months from the date of the court order.

6.2　　Guaranty and Third Party Security Agreement.　The Guarantor (Patricia Baker) shall acknowledge this Agreement, by signing this Agreement. In acknowledging this Agreement, the Guarantor hereby agrees and acknowledges that her Continuing Guaranty – Recourse continues to guaranty the obligations that are due and owing to Producers by Delong including the obligations owed under the 2021 Contract and the Non-Dischargable Claim. Further, in acknowledging this Agreement, the security interest granted by Guarantor continues to secure the obligations due and owing Producers.

6.3    2017 Confirmation Order Terms.  Except as modified herein, the 2017 Confirmation Order Terms are hereby incorporated herein and are a part of the 2021 Contract.

6.4    Interest Rate.  Interest accrues at three percent (3%) over prime.

6.5    Written Notice.  Written Notice may include email correspondences from Delong or his agent Patricia Baker to both Lauri Poulsen and Ray Connelly.

6.6    Additional Events of Default.  In addition to the Events of Default set forth in the 2021 Contract, it shall also constitute an Event of Default under the 2021 Contract if this Agreement is not timely approved by the Bankruptcy Court or an event occurs in the 2022 Bankruptcy case that Producers reasonably believes will impair its ability to receive timely payments under the 2021 Contract or that the Producers Livestock will be impaired.

6.6    Effect of Modification.  The modifications described herein shall be deemed to form a part of the 2021 Contract.  Nothing contained in this Agreement shall in any way waive, annul, vary and affect any provision, condition, covenant or agreement contained in the 2021 Contract, except as specifically modified herein, nor affect and impair any rights, powers and remedies under the 2021 Contract.  Except as modified herein, all other terms of the 2021 Contract remain in full force and effect.

7.    No Course of Dealing or Conduct.  Feeder understands, acknowledges and agrees that Producers' execution of this Agreement does not constitute a course of dealing or conduct between the Parties, or create any expectations, rights, duties or obligations except as expressly set forth herein.

8.    Final Agreement.  This Agreement, the amendments to the 2021 Contract, the 2021 Contract, and other related documents, are intended as the complete integration and expression of all understandings between the Parties about the subject matter hereof and supersedes all prior discussions, negotiations, representations, or agreements, whether written or oral.  Feeder affirms that no understanding, agreement or representation which is inconsistent or in conflict with the terms of this Agreement has been made by or on behalf of Producers.

9.    No Oral Modification or Waiver.  This Agreement and the duties and obligations hereunder, including specifically this provision, may only be altered, amended, modified, released or waived by a written instrument signed by an authorized officer, employee or agent of Producers and delivered to Feeder.  Absent such a signed and delivered written instrument, no alteration, amendment, modification, release, waiver or other change in the express written terms of this Agreement may be implied or inferred under any circumstances, including from the relationship of the parties, from performance or partial performance, or under any equitable theory, principle or doctrine, including promissory estoppel.

10.    Relationship of Parties.  The relationship of Feeder and Producers under this Agreement and the other related documents is and shall continue to be solely that of creditor and debtor.  Feeder acknowledges that Producers has acted at all times within the normal and customary scope of a creditor in a commercial business transaction.  Nothing contained in this

Agreement or in any document referred to herein shall be deemed or construed to create a special relationship of trust or confidence, or a partnership or joint venture between Producers and Feeder. Feeder acknowledges that there are no fiduciary obligations, fiduciary duties, or fiduciary relationship between the Producers and Feeder.

11. **Jury Waiver**. **TO THE FULLEST EXTENT PERMITTED BY LAW, THE PARTIES HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING ARISING UNDER, BASED UPON OR RELATED TO THIS AGREEMENT, INCLUDING BUT NOT LIMITED TO ANY ACTIONS ARISING FROM TORT OR CONTRACT CLAIMS.**

12. No Third Party Beneficiaries. The enforcement of the terms and conditions of this Agreement and all rights of action relating to such enforcement, shall be strictly reserved to the Parties to the Agreement, and their respective successors and assigns. Nothing contained in the Agreement or the related documents shall give or allow any claim or right of action whatsoever by any other person or entity as beneficiary; all such non-parties shall be deemed incidental beneficiaries only.

13. Further Assurances. The Parties to this Agreement shall execute and deliver such additional documents and instruments and to take such actions as may be reasonably necessary in order to further evidence and carry out the purposes, goals, and intent of this Agreement, and to correct any error in this Agreement or any documents executed in connection herewith that was caused by any clerical mistake, computer malfunction, printing error or similar error.

14. Severability. If any covenant, term or provision contained in this Agreement is held by a court of competent jurisdiction to be invalid, illegal, or unenforceable in any respect, such covenant, term, condition or provision shall be severed or modified to the extent necessary to make it enforceable, and the resulting Agreement shall remain in full force and effect, and such invalidity or other failure shall not affect the validity of any other covenant, term or provision hereof.

15. Counterparts; Electronic Signatures. This Agreement may be executed in any number of counterparts all of which, taken together, shall be deemed to be one and the same instrument and shall constitute the entire agreement between the parties. This Agreement may be executed using electronic signatures and will be effective and binding as fully as a manually executed instrument.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

PRODUCERS LIVESTOCK                     FEEDER:
MAREKTING ASSOCIATIONS
                                        MARK DELONG

By: _~Ric O'Brien_____             By: _MdGh_____
Title: _President_____

ACKNOWLEDGED:
PATRICIA BAKER, GUARANTOR

By: _____

THIRD AMENDMENT TO PRODUCERS LIVESTOCK MARKETING ASSOCIATION
FEEDING AND GRAZING CONTRACT AND AGREEMENT - 9